# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5096 | **DATE** | 8/20/2003 |
| **CASE TITLE** | Clever Ideas, Inc. vs. Citicorp Diners Club, Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 9/18/03 at 9:30 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The court grants Citicorp's motion for judgment on the pleadings (Doc. 22-1) with respect to Counts V through VIII and dismisses those counts without prejudice, but denies Citicorp's motion to dismiss Counts I through III. The court denies Clever Ideas' motion for partial summary judgment (Doc. 29-1), and therefore strikes Citicorp's cross-motion for partial summary judgment (Doc. 36-1) as moot (except for the portion requesting a declaratory judgment, which the court denies on the merits). Clever Ideas' motion to strike portions of Citicorp's response to Clever Ideas' statement of undisputed material facts (Doc. 53-1) is denied as moot, as the court did not rely on any of those disputed statements in deciding these motions. The parties are directed to meet and confer prior to next status to discuss a settlement of their differences.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | **2** number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | AUG 2 2 2003 date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | **58** |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 8/20/2003 date mailed notice | |
| ETV | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 03 AUG 20 PH 2:23 | ETV6 mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

Minute Order Form (06/97)

CLEVER IDEAS, INC.,                     )
an Illinois corporation,                )
                                        )
        Plaintiff/Counterdefendants,    )
                                        )
    v.                                  )       No. 02 C 5096
                                        )
CITICORP DINERS CLUB, INC., a           )       Judge Rebecca R. Pallmeyer
Delaware corporation,                   )
                                        )
        Defendants/Counterplaintiff.    )

## MEMORANDUM OPINION AND ORDER

This case arises from the parties' now-terminated business venture to provide dining discounts at certain restaurants to holders of Defendant's Diners Club charge cards. Plaintiff Clever Ideas, Inc. ("Clever Ideas" or "CLI") designed and implemented the restaurant discount program, in which Diners Club cardholders received discounts at participating restaurants and Defendant Citicorp Diners Club ("Citicorp" or "CDC") and Clever Ideas shared the membership fees paid by cardholders. Clever Ideas filed this action against Citicorp, a franchisee of the issuer of Diners Club charge cards, after Citicorp terminated the parties' 1990 Agreement in April 2002.

Clever Ideas' complaint alleges several claims against Citicorp. First, Plaintiff claims that Citicorp's failure to immediately replace cards bearing Plaintiff's trademarked "LeCard" logo, following termination, constituted statutory and common law trademark infringement (Counts I and II), and unfair competition under section 43(a) of the Lanham Act (Count III).[1] Second, Plaintiff claims Citicorp's use of the LeCard mark in a second program, involving corporate card holders, constituted a breach of contract (Count IV), common law and statutory trademark infringement

---

[1] When Clever Ideas filed the Complaint, it also filed a motion for a preliminary injunction, asking the court, among other things, to order Citicorp to immediately issue new credit cards to all its customers with the LeCard logo eliminated. Clever Ideas later withdrew that motion. (See Docket No. 3-1.)

58

(Counts V and VII) and unfair competition under section 43(a) of the Lanham Act (Count VI). Finally, Clever Ideas alleges that Citicorp's termination of the parties' agreement violates the Illinois Uniform Deceptive Trade Practices Act (Count VI) as well as the implied covenant of good faith and fair dealing (Count X). In Count IX, Clever Ideas also requested a declaratory judgment pursuant to 28 U.S.C. § 2201.

These claims encompass two alternate theories. The first theory is that Citicorp breached the 1990 Agreement by refusing to split the fees generated from the Citicorp Corporate Card program on an equal basis with Clever Ideas. The second theory is that the Corporate Card program was not covered by the parties' 1990 Agreement at all, and therefore Citicorp's use of the LeCard mark in conjunction with that program constitutes copyright infringement.

Citicorp filed an Answer and Counterclaim against Clever Ideas, alleging breach of contract in Counts I and II, and seeking injunctive relief in Count III. Citicorp now moves for judgment on the pleadings, arguing that any claims brought under Clever Ideas' second theory (the portions of Counts I, II, and III that apply to the Corporate Card program, and the entirety of Counts V, VI, VII, and VIII) are time-barred. Citicorp maintains that Clever Ideas was aware at least as early as 1997 that Citicorp was offering the LeCard restaurant program to corporate cardholders, and therefore waited too long to file its infringement claims against Citicorp. Citicorp also argues that Counts V through VIII depend upon the conclusion that Citicorp was not authorized to use the LeCard mark and logo in connection with the Corporate Card program, but because the pleadings show that Citicorp did have a license to use the mark and logo, these claims fail as a matter of law.

In addition, the parties have filed cross-motions for partial summary judgment. Clever Ideas requests that the court declare that the provisions of the 1990 Agreement that Citicorp invoked as grounds for terminating the contract are unenforceable as a matter of law. Accordingly, Clever Ideas urges, the court should declare Citicorp bound by the three-year non-compete provision contained in the 1990 Agreement. Clever Ideas also moves for summary judgment on Count I of

2

Citicorp's Counterclaim, in which Citicorp alleges that Clever Ideas materially breached the 1990 Agreement. In its cross-motion, Citicorp argues that the challenged provisions of the 1990 Agreement are indeed enforceable; in the alternative, Citicorp contends, should the court conclude those provisions are invalid, it must declare the entire 1990 Agreement unenforceable because without those provisions, the Agreement is rendered meaningless. Finally, Citicorp requests judgment on Count IX of Clever Ideas' complaint (for a declaratory judgment that Clever Ideas did materially breach the agreement and that Citicorp is not bound by the non-compete provision of the Agreement).

The court will address all of the parties' motions in this opinion, but notes that they are governed by different standards. For purposes of a motion for judgment on the pleadings, the court considers the pleadings alone, which include the complaint, the answer, and any written instruments attached as exhibits. FED. R. CIV. P 12(c); *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (citations omitted). When reviewing a 12(c) motion for judgment on the pleadings, the court will employ the same standard as when reviewing a motion to dismiss under Rule 12(b), and will grant such a motion if "it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (citations omitted). The court views the facts in the complaint in the light most favorable to the nonmoving party, but is not obliged to ignore any facts that undermine the plaintiff's claim, nor to assign any weight to unsupported conclusions of law. *Id.* (citations omitted).

On a motion for summary judgment, on the other hand, the court is free to consider materials going beyond the pleadings. Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S.

317, 322-23 (1986); *Alexander v. Wisconsin Dep't of Health and Family Services*, 263 F.3d 673, 680 (7th Cir. 2001). A genuine issue of material fact exists "only if there is sufficient evidence for a jury to return a verdict for that party." *Alexander*, 263 F.3d at 680 (citing *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999)). When making this determination, the court must examine the evidence and draw all reasonable inferences in favor of the nonmoving party. *Alexander*, 263 F.3d at 680. These standards apply even where, as here, both parties have moved for summary judgment. The court will consider the merits of each motion separately and draw reasonable inferences in favor of the non-movant on each motion; this "Janus-like perspective . . . sometimes forces the denial of both motions," but only where there are material facts in dispute. *Buttitta v. City of Chicago*, 803 F.Supp. 213, 217 (N.D. Ill.1992). The Seventh Circuit has observed that cases involving contract disputes are particularly well-suited to disposition upon summary judgment. *Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 871 (7th Cir. 2001); *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 419 (7th Cir. 1998), *cert. denied*, 526 U.S. 1087 (1999).

The court first explains the factual background of the case in greater detail, and then presents reasons for its conclusion that Citicorp's motion for judgment on the pleadings will be granted in part and denied in part, and both parties' motions for partial summary judgment are denied.

## I.    FACTUAL BACKGROUND

### A.    Factual Background Supplied in the Pleadings

Plaintiff Clever Ideas, Inc. is an Illinois corporation with its principal place of business in Chicago, Illinois. (Complaint ¶ 3.) Clever Ideas designs, markets and implements a variety of programs to assist restaurants with financing, marketing, and tracking information for the purposes of understanding trends and increasing business. (*Id.* ¶ 7.) Defendant Citicorp Diners Club, a Delaware corporation with its principal place of business in Chicago, is a franchisee of Diners Club

International Ltd., and is authorized to issue Diners Club charge cards in the United States. Citicorp operates a system that processes the exchange of financial and non-financial data between Citicorp, participating issuers of credit cards, financial institutions, and processors. (*Id.* ¶¶ 4, 14.)

One of Clever Ideas' programs is its "LeCard" marketing and financing plan, pursuant to which Clever Ideas advances cash to participating restaurants based on estimates of annual credit card sales.[2] The participating restaurants repay Clever Ideas for the cash advance by forwarding to Clever Ideas all credit card payments made by their customers, with each transaction reducing the restaurant's credit balance. (*Id.* ¶ 8.)

Clever Ideas owns the "Le Card" trademark, which the company and its predecessors have used continuously since at least August 30, 1987. (*Id.* ¶ 9; U.S. Trademark No. 1,526,094 (issued Feb. 21, 1989).) Clever Ideas also owns a common law trademark in the LeCard logo, which Clever Ideas has used continuously in interstate commerce in connection with the dining program since as early as August 30, 1987. (*Id.* ¶ 12.)

1.    **Overview of the LeCard Plan**

On November 6, 1990, Clever Ideas and Citicorp entered into the "LeCard Card Agreement" ("Agreement" or "1990 Agreement"), pursuant to which the two companies agreed to collaborate to make discount services at certain restaurants available to Diners Club cardmembers, using the LeCard marketing and financing plan. (*Id.* ¶ 15.) Under the plan, Diners Club cardmembers would receive a discount if they dined at a "member restaurant," defined as a restaurant that had an agreement with Citicorp to honor Diners Club cards, and had also entered into a cash-advance loan agreement with Clever Ideas. The purpose of the parties' Agreement was to use the LeCard discount to entice Citicorp cardmembers to patronize member restaurants more frequently, thereby

---

[2]    The record does not indicate whether Clever Ideas was involved in making these estimates, or whether the restaurants came up with them on their own.

increasing the rate of Diners Club card use, and presumably increasing the profitability of the member restaurants. (*Id.* ¶ 16.)

As described in the parties' written Agreement, when a cardmember presented his Diners Club card to a member restaurant for payment of a bill, the restaurant would create a document of charge ("sales draft"), which the restaurant would send to Clever Ideas as partial payment of the cash advance Clever Ideas had previously given the restaurant. Clever Ideas would then prepare a document ("credit draft") reflecting 20% of the cardmember's total restaurant bill and present both the sales draft and the credit draft to Citicorp for payment of the net amount (sales draft minus credit draft), or 80% of the cardmember's total restaurant bill.[3] (*Id.* ¶ 17.) Although this sequence of events was set forth in the Agreement, in practice the money passed more directly: the sales drafts and credit drafts were sent directly from the restaurant to Citicorp for payment, at which point Citicorp would remit the net amount (80% of the restaurant bill) to Clever Ideas. (*Id.* ¶ 18.)

After paying the net amount to Clever Ideas, Citicorp would charge and collect from the member restaurant a processing fee of 2.9% of the cardmember's total bill, charge and collect from Clever Ideas processing fees amounting to 3.5% of the cardmember's total restaurant bill, process and settle the cardmember's purchase, and ultimately cause the cardmember's monthly billing statement to reflect the discount for the meal purchased at the member restaurant. Citicorp recoups its share of the cost of the program only when the cardmember pays the monthly bill. (*Id.* ¶ 19.) The program was intended to be an attractive member benefit for which cardmembers would pay an additional fee. (Answer ¶ 12.) Citicorp expected that the availability of the dining discount would increase Citicorp's cardmember base and reduce attrition and would entice cardmembers to dine out more frequently, thereby increasing the rate at which they used their

---

[3]    Article II(B)(2) of the Agreement defines the discount to be 25% of the member restaurant's standard price for food and beverages, but in practice the parties consistently calculated this discount to be 20% of the cardmember's post-tax and post-tip restaurant bill. (*Id.* ¶ 20.)

Diners Club cards. In addition, the dining discount program was meant to encourage restaurants which previously did not accept the Diners Club card as a form of payment to do so. (Answer ¶ 8.) Clever Ideas benefitted from the Plan because it earned money through financing and marketing arrangements with member restaurants. (*Id.* ¶ 10.)

With respect to several critical terms, the Agreement is not a model of precision. For example, no firm figure is set as the fee to be paid by cardholders. Instead, the Agreement merely stated:

> Any fee charged to Cardmembers in connection with the LeCard Card or the Plan shall be determined from time to time upon mutual consent of the parties. Any such fee shall be divided between CLI and CDC as the parties agree from time to time.

(Agreement Art. II(A)(2)(b).) Nor did the Agreement impose any specific mandatory obligations on Citicorp. Instead, it simply provided that Citicorp would market the LeCard Card to "eligible" Diners Club cardmembers with "reasonable frequency and a reasonable format." (Agreement Art. II(A)(1), Ex. C to Complaint.) Citicorp agreed to use its best efforts to cause Citibank of South Dakota[4] to offer and issue the LeCard Card to eligible cardmembers, and the Agreement contemplated that the "LeCard Card [would] be issued from time to time to existing Eligible Diners Club Cardmembers as a supplemental feature of the Diners Club Card." (Agreement Art. II(A)(2)(a).) "Eligible" cardmembers were identified in the Agreement as cardmembers who were "(a) a Personal (individual/consumer) Diners Club Cardmember or (b) a Corporate/Government/ Company/University Diners Club Cardmember which CDC in its sole discretion has determined shall be eligible for the Plan." (Agreement Art. I(F).) This language indicates that the parties contemplated a corporate plan, in some form, even back in 1990.

Clever Ideas likewise was bound by the Agreement only to "use its best efforts to promote and publicize to restaurants" the availability of the plan, and also agreed to establish and maintain

---

[4]     With whom CDC contracted to administer the LeCard plan.

a "sufficient" number of member restaurants to adequately support the plan. (Agreement Art. III(C).) The parties do not dispute that the 1990 Agreement did not explicitly define best efforts, nor did it identify any specific actions that Clever Ideas was required to take to satisfy the provision. Nor did the Agreement set a particular number of restaurants that would be sufficient to adequately support or sustain the plan. The Agreement did require Clever Ideas to submit, on a quarterly basis, a list of all member restaurants for dissemination by Citicorp to all LeCard cardholders. (Agreement Art. II(B)(1).) The Agreement also stated that "CLI agrees to provide to CDC, on an annual basis and within 30 days after its preparation, a copy of CLI's annual balance sheet as of the end of CLI's fiscal year and CLI's income statement for such year." (Agreement Art. IV(D)(3)(b).) The parties agreed that the contract could only be amended or modified by a writing signed by officers of both Clever Ideas and Citicorp that specifically refers to the Agreement. (Complaint ¶ 25.)

The 1990 Agreement provided that its "validity, interpretation and performance . . . will be controlled by and construed under the laws of the State of Illinois." (Agreement Art. IV(K), Ex. A to CLI's 56.1.)

### 2.    License to Use LeCard Trademark

The operation of the plan required that Citicorp have the ability to use the LeCard marks. Therefore, in the Agreement, Clever Ideas granted Citicorp an exclusive license to use the LeCard marks for the duration of the Agreement. (Complaint ¶ 21.) With respect to this license, Citicorp agreed, among other things, that:

(1)    no design featuring the LeCard marks may be used without the prior written consent of CLI;

(2)    during the term of the Agreement and after its termination, CDC would execute documents CLI may request to ensure that all right, title and interest in and to the Le Card marks reside in CLI, and except as otherwise set forth in the Agreement neither during nor after the termination of the Agreement shall CDC assert any claim to such goodwill;

(3) CDC would notify CLI promptly of any possible infringements, imitations or unauthorized possession, knowledge or use of the LeCard marks by others of which CDC becomes aware; and

(4) CDC would take no action that could be detrimental to the good will associated with the Le Card marks or with CLI.

(Agreement Art. IV(A)(2)(a), (b) and (c)) (numbers supplied by the court). Pursuant to the license and Agreement, the LeCard marks were imprinted on the back of the Diners Club charge cards. (Complaint ¶ 21.)

### 3. Provisions on Termination

The parties agreed that the contract would be renewed automatically for successive one-year terms unless terminated by either party on 60 days advance written notice. (Agreement Art. IV(D)(1).) The Agreement also provided that if either party materially breached or failed to perform any of its "material obligations hereunder . . . and such failure [remained] uncured for 30 days after a party receives written notice from the other party, such other party may terminate the Agreement effective upon receipt of written notice to that effect by the breaching party." (*Id.* Art. IV(D)(2).) In addition, the Agreement authorized Citicorp to terminate the Agreement "upon written notice," if, in its "reasonable discretion," Citicorp determined (1) that there was a materially adverse change in Clever Ideas' business or financial condition, (2) that the plan had insufficient consumer appeal, or (3) that there was an insufficient number or type of member restaurants to maintain consumer appeal of the plan.[5] (*Id.* Art. IV(D)(3)(b) and (c).)

Certain rights and obligations arose on termination. First, the Agreement provided that "after the termination of this Agreement, CLI and CDC shall refrain from the use of any names, logos or marks of the other party, except if such use is necessary to: (i) wind down the Plan; or (ii) bill and/or collect LeCard Card balances." (*Id.* Art. IV(D)(6)(c).) The wind-down provision of the Agreement contemplated that "[u]pon any termination of the Agreement, except as otherwise

---

[5] Other provisions regarding termination are not relevant to the present dispute.

9

provided herein, the parties hereto shall each continue to perform . . . each of their respective obligations in accordance herewith upon the same terms and conditions as are herein set forth for a period of 180 days following the effective date of such termination." (*Id.* Art. IV(D)(6)(b).)

Article IV, Section C(1) stated that if Citicorp were to terminate the Agreement for any reason other than Clever Ideas' material breach, a material change in control of Clever Ideas, or Clever Ideas' bankruptcy or insolvency, then "for a period of three (3) years after the effective date of such termination CDC will not enter into a LeCard-type barter arrangement with any third party, nor will it itself establish such a program." (*Id.* Art.IV(C)(1).) Finally, Article IV, Section I provided that:

> [s]hould any Section of this Agreement be declared invalid for any reason, such decision shall not affect the validity of any other Sections, which other Sections shall remain in force and effect as if this Agreement had been executed with the invalid Section(s) eliminated, and it is hereby declared the intention of the parties that they would have executed the other paragraphs of this Agreement without including therein any such Section(s) which may for any reason be hereafter declared invalid.

(Id. Art. IV(I).)

### 4.    Performance of the Agreement

The record contains little information about the earliest years of the plan's implementation, but it appears there was some friction from the beginning. As early as 1993, Citicorp complained that there were not enough member restaurants to sustain the plan. For its part, Clever Ideas complained that Citicorp did not adequately promote and support the plan, and argued that the restrictions Citicorp placed on Clever Ideas' marketing and efforts to expand the plan contributed to the fact that there were not more member restaurants. (*Id.* ¶ 38; *see, e.g.,* Letter from Thomas Higgins to Yana Schneider of Jan. 9, 1997, Ex. B to Answer.)

Beginning in late 1995 and early 1996, Citicorp began to offer a corporate LeCard plan to its corporate cardmembers, issuing corporate Diners Club cards with the LeCard mark, and periodically distributing an updated list of restaurants at which corporate cardmembers could

receive a discount.[6] (*Id.* ¶ 28.) The Corporate Card plan was similar to the individual plan, but unlike the individual plan, the cardmember discount was not reflected as a credit on the corporate cardmember's monthly Diners Club statement. Rather, Citicorp issued the corporate cardmember's employer (who often was ultimately responsible for paying the monthly balance on the card) a quarterly rebate check representing the total discount accumulated by all of the employer's cardholders over a three-month period. (*Id.* ¶ 30.) Another difference significant to this litigation was that instead of the 20 percent discount given to individual cardmembers, Citicorp awarded its corporate cardholders a 15 percent discount. Citicorp nevertheless still paid CLI only 80 percent of the total of each corporate cardmember's restaurant bill, but then Citicorp recouped 85 percent of the total, thus earning an additional five percent per restaurant purchase by a corporate cardholder. Citicorp pocketed the extra five percent, a bonus that Clever Ideas claims constitutes a breach of the Agreement.

The record does not reveal precisely when Clever Ideas learned of the Corporate Card plan, but there were communications between the parties concerning the matter as early as January 1997. On January 9, 1997, Thomas Higgins, Clever Ideas' Senior Vice-President, wrote to Yana Schneider of Citicorp "[i]n response to [Schneider's] January 8, 1997 letter regarding corporate LeCARD." (Letter from Higgins to Schneider of Jan. 9, 1997, Ex. B to Citicorp's Answer and Counterclaim.) Among other things, Higgins wrote that "[w]e have never agreed to and do not currently agree to the activation of any cardmembers [sic] card, personal or corporate, to the LeCARD program without that card having the LeCARD logo properly displayed on it." (*Id.*) In another portion of the letter, Higgins addressed participation by the IBM Corporation in the LeCard program, expressing his concern that the amount spent by IBM was insufficient to support the costs

---

[6]     The record does not indicate whether the list of restaurants sent to corporate cardmembers was identical or different from the one sent to individual members.

associated with their participation.[7] Higgins discussed the cost of distributing restaurant directories ($2.00 each) to each of IBM's cardmembers, and complained that their monthly spending did not generate a profit over the cost of distributing the directories. (*Id.*) Higgins estimated that if IBM were to double its usage at LeCard restaurants, resulting in $720,000 total annual sales for IBM card holders, the revenue generated would be $43,200 ($720,000 x .06).[8] Higgins noted that "[t]he 6% is assumed based upon 3.5% additional revenue to Diners Club currently generated by the LeCARD charges and 2.5% of additional revenue generated should CLI agree to split equally with Diners Club the 5 percentage point reduction in savings offered to corporations."[9] (*Id.*)

Following further negotiations, Clever Ideas apparently softened its demand that the LeCard logo appear on every corporate Diners Club card. A January 28, 1997 letter from Higgins to Schneider set forth terms "by which CLI would agree to permit the activation of the LeCARD program for Citicorp corporate Diners Club cardholders without displaying the LeCARD logo on the back of those Diners Club cards." (Letter from Higgins to Schneider of Jan. 28, 1997, ex. C to Citicorp's Answer and Counterclaim.) Higgins stated that Clever Ideas would agree to this as long as "[a]ctivation would apply only to Citicorp corporate Diners Club cards," and "[a]ll cards . . . would be issued new corporate Diners Club cards with the LeCARD logo displayed on the back of the card at the first possible opportunity to do so." (*Id.*) Thus, as of January 1997, Clever Ideas was at the very least aware of Citicorp's plan to initiate the Corporate Card Plan, and was eager to have

_____

[7]    Higgins' letter indicates that IBM was already actively participating in the LeCard program.

[8]    Higgins' letter does not clarify whether this additional revenue would go to Clever Ideas only, or Citicorp as well (6 percent was apparently the amount that Higgins believed the parties were generally recovering under the Agreement).

[9]    The impression given by this assertion is that it was Clever Ideas, and not Citicorp which benefitted from the 5 percent spread, which is inconsistent with most of Clever Ideas' other assertions described herein. Viewed in the light most generous to Clever Ideas, the letter might be understood as reflecting Higgins' assumption that at some future point, Clever Ideas would be recovering the profits.

12

the LeCard mark placed on the corporate cards.[10]

Nevertheless, Clever Ideas alleges that it was not aware of the five percent difference between corporate and individual cardholders until sometime in 1998. (Complaint ¶ 31.) At that point, when Clever Ideas alleges it learned for the first time of the lower discount awarded to corporate cardholders, Clever Ideas requested that Citicorp refund to Clever Ideas one-half of the funds Citicorp had collected under the Corporate Card program (i.e. one half of the extra five percent). (Complaint ¶ 33.) On March 30, 1999, Heather Turk, a Senior Vice President for Citicorp, wrote to Lee Suckow, President of Clever Ideas, in response to Clever Ideas' request for a refund. In her letter, Turk stated that "[w]e believe that our written agreement does not contemplate a Corporate Card program because the program did not exist when the agreement was signed, and because the agreement has not been amended to cover it. Whatever we agree to do with the funds on hand is a matter to be agreed upon outside of the written agreement." (Letter from Turk to Suckow of March 30, 1999, Ex. E to Complaint.) Turk proposed that Citicorp would split the five percent fee if Clever Ideas met certain goals, including: a) increasing the number of member restaurants in the program (the letter set forth numerical goals to be met by the year 2000); b) growth in the number of transactions; c) an increase in the amount of money spent per transaction; d) an increase and improvement in marketing; and e) improvements in service that would result in fewer refusals of cards in transactions and shorten the time taken to resolve problems. (*Id.*) Turk wrote that "[o]nce program goals are mutually agreed upon and a structure is put in place to meet them, Diners Club will pay LeCard 2.5% of Corporate Restaurant Spend." (*Id.*) The letter also contemplated a willingness to remit the same percentage in the future as well. (*Id.*) A final condition of Turk's letter was that Clever Ideas "agree with Diners Club to completely

---

[10]     The letters are not entirely clear on this point, but their contents (particularly the references to IBM's participation) indicate that Clever Ideas was aware that the Corporate Card program had already been put into place by Citicorp.

restate our current written agreement since it does not reflect the current relationship between us." (*Id.*) Turk asked Suckow to accept the proposals in the letter by signing at the bottom, which he did do on March 31, 1999. (*Id.*) On or shortly after March 30, 1999, Citicorp paid Clever Ideas $263,789, one-half of the five percent fee (without interest) that had accrued through the end of December 1998. (*Id.*)

Citicorp has not paid Clever Ideas any portion of the one-half of the five percent fee collected from corporate cardmembers since December 1998, nor has Citicorp otherwise compensated Clever Ideas for Citicorp's use of the LeCard marks in connection with the Corporate Card plan. (*Id.* ¶ 34.)

### 5.    The Agreement is Terminated

On April 17, 2002, Mark Smalls, Executive Vice President of Citicorp, sent written notice to Clever Ideas of his intention to terminate the Agreement. (Letter from Smalls to Suckow of April 17, 2002, Ex. G to Complaint.) Smalls stated that Clever Ideas had breached the Agreement in purportedly material ways, and for that reason, threatened to terminate the Agreement unless the breaches were cured within 30 days. Specifically, the letter charged Clever Ideas with the following breaches of the Agreement:

(1)    Failure to use its best efforts to promote and publicize to restaurants the availability of the Plan (as defined in the Agreement);

(2)    Failure to maintain Member Restaurants (as defined in the Agreement) of a sufficient number and quality to sustain the Plan;

(3)    Failure to maintain a sufficient number of Member Restaurants to maintain consumer appeal of the Plan;

(4)    Failure of CLI to perform all services in accordance with the highest standards of the industry as required by the Agreement, thereby diminishing the goodwill of CDC's brand name and trademarks; and

(5)    Failure to provide CLI's balance sheet and income statement as required by the Agreement so that CDC may determine whether or not there has been a material adverse change in CLI's business.

14

(*Id.*) (Numbers supplied by the court). Smalls referenced the March 1999 letter from Turk in which Clever Ideas agreed to meet specific targets, and stated his belief that Clever Ideas failed to meet those goals. To cure the alleged breaches, Smalls demanded that within 30 days, Clever Ideas increase the number of member restaurants to 1,800 and provide Citicorp with its required financial statements. (*Id.*) Otherwise, Smalls wrote, "CDC will have no alternative but to terminate the Agreement at that time." (*Id.*)

Clever Ideas' attorney, Wendi Sloane, responded to the allegations contained in Smalls' letter in a May 14, 2002 letter to Citicorp's counsel, Javier Rubinstein. (Letter from Sloane to Rubinstein of May 14, 2002, Ex. H to Complaint.) Sloane denied that Clever Ideas had materially breached the Agreement, and noted that to the extent Clever Ideas' efforts had not achieved success, this was due to Citicorp's own material breaches of the Agreement. (*Id.*) Sloane also questioned Citicorp's assumption that the goals listed in the March 1999 letter were contractual obligations, and therefore denied that Clever Ideas' failure to meet those goals constituted a material breach of the Agreement. (*Id.*) Sloane further responded to Citicorp's complaint about the number of member restaurants by pointing out that the Agreement contemplated such an issue as a basis for termination, not as a material breach. Therefore, if Citicorp were to terminate the Agreement for this reason, it would be subject to the three-year non-compete provision of the Agreement, and would be required to issue new Diners Club cards without the LeCard mark on them. (*Id.*)

In a May 21, 2002 letter, Rubinstein denied that Citicorp had breached the Agreement. (Letter from Rubinstein to Sloane of May 21, 2002, Ex. I to Complaint.) He asserted that because the 30-day period since Citicorp's initial April 17, 2002 letter to Clever Ideas had passed and Clever Ideas had failed to meet Citicorp's demands, Citicorp now considered the 1990 Agreement terminated. (*Id.*) The letter reiterated what Citicorp considered to be Clever Ideas' breaches of the Agreement, mirroring the charges made in the April letter. (*Id.*) Rubinstein declared that Clever

15

Ideas' failure to furnish Citicorp with a balance sheet and income statement information

> constitutes a material breach of the 1990 Agreement. Under Article IV.D.3(b), CDC is entitled to terminate the 1990 Agreement if it determines "that there is a materially adverse change in CLI's business or financial condition . . . ." Obviously, the only means by which CDC could determine whether CLI is financially capable of fulfilling its obligations under the 1990 Agreement and maintaining the Plan is to review its annual balance sheet and income statements . . . . [T]he continual decline in the number of restaurants . . . indicated to CDC that CLI's financial condition had probably substantially deteriorated. Because CLI failed to provide financial information . . . CDC was left with no choice but to rely on the information that it had, which indicated a "materially adverse change in CLI's business or financial condition."

(*Id.*)

Upon termination of the Agreement, Citicorp did not immediately issue new Diners Club cards that do not bear the LeCard mark. Rather, Citicorp stated that it would "replace [such cards] in the ordinary course of its business as cards are renewed," even though Clever Ideas has alleged that replacing the cards in such fashion could take up to three years to accomplish. (Complaint ¶ 50.) Citicorp has maintained that because Clever Ideas materially breached the contract, Citicorp does not have any obligation to comply with the Agreement's requirement that Citicorp continue to perform its obligations under the Agreement for 180 days following its termination, and has informed Clever Ideas that it will not comply with the Agreement's wind-down provisions. (*Id.* ¶ 52.)

### B. Additional Factual Background Relevant to the Parties' Cross Motions for Partial Summary Judgment

For the purposes of the parties' cross-motions for summary judgment, the court shall summarize additional facts contained in the parties' Rule 56 statements of material fact and additional documents submitted in connection with those motions.

In a letter dated December 9, 1993, Patricia Foell, Senior Vice President for Citicorp, advised Lee Suckow of Clever Ideas that she did "not believe the current LeCARD program offers a sufficient number of restaurants in most markets to maintain consumer appeal." (Letter from Foell to Suckow of Dec. 9, 1993, Ex. 2(A) to Citicorp's 56.1.) Foell's letter attached a list of "the

current markets, the current number of participating restaurants, and the number [Citicorp believed was] needed to maintain consumer appeal and to enable us to actively and effectively market the LeCARD program to our Cardmembers in each market." (*Id.*) Clever Ideas' response, if any, is not in the record.

Heather Turk, Senior Vice President of Marketing for Citicorp, wrote to Thomas Higgins of Clever Ideas on December 5, 1995. In the letter, Turk related that Citicorp had been notified of a new agreement between Transmedia (a dining discount program similar to LeCard) and American Express. Turk noted that this "would give American Express a restaurant discount dining program with over 4,000 participating restaurants. This puts our LeCard program at an intolerable competitive disadvantage." (Letter from Turk to Higgins of Dec. 5, 1995, Ex. F to Complaint.) Turk wrote that "[w]ithout dramatic improvement, please consider yourselves on notice that the LeCard Plan cannot be sustained in its current form at such a disadvantage. We would like to review LeCard's plans to expand in both quantity and quality of participating restaurants to effectively compete with American Express." (*Id.*) As with the 1993 letter, there is no record of Clever Ideas' response.

At no time prior to the termination of the 1990 Agreement did any Clever Ideas employee ever inform any Citicorp employee that Clever Ideas did not understand the meaning of the 1990 Agreement. (CDC's 56.1 Statement ¶ 46.)

## DISCUSSION

I.      **Motion for Judgment on the Pleadings**

In its motion for judgment on the pleadings, Citicorp asks the court to dismiss all claims in Clever Ideas' complaint that charge Citicorp with trademark infringement. Citicorp contends that because Clever Ideas knew of and consented to Citicorp's use of the LeCard mark and logo in connection with the Corporate Card program at latest since 1997, Clever Ideas is now barred from

raising these allegations under either the statute of limitations or the doctrine of laches. (Reply Memorandum in Support of Citicorp's Motion for Judgment on the Pleadings, hereinafter "Citicorp Reply," at 3.) Clever Ideas responds that its claims are not time barred because it was not aware of Citicorp's infringement and other deceptive practices until May 21, 2002, when Rubinstein asserted in his letter to Sloane that the Corporate Card program was not governed by the 1990 Agreement. (Clever Ideas' Memorandum of Law in Opposition to Citicorp's Motion for Judgment on the Pleadings, hereinafter "Clever Ideas' Mem.," at 5.) Citicorp contends, however, that the 1997 Higgins/Schneider correspondence and the 1999 Turk letter put Clever Ideas on notice of the Corporate Card program and Citicorp's use of the LeCard mark. According to Citicorp, Rubinstein's letter meant only that the 1990 Agreement did not require Citicorp to pay Clever Ideas a fee for the Corporate Card program, because no such program was in effect as of 1990; but the 1990 Agreement did contemplate and permit Citicorp to initiate a Corporate Card program. (Citicorp Reply, at 3.)

Citicorp's argument that Counts I through III are time barred merits little discussion. These counts relate to Citicorp's post-termination actions. (Complaint ¶¶ 54, 55, 59, 61, 62, 66, 68, 69.) Given that this action was filed the same year that the contract was terminated, the court fails to see how these claims may be construed as time barred. In this court's view, the sole issue with regard to these post-termination counts is whether Citicorp's actions in refusing to immediately re-issue Diners Club cards that did not display the LeCard mark or logo were justified. That precise issue has not been raised by any of the motions now before the court, and therefore the court simply denies Citicorp's motion for judgment on the pleadings with respect to these claims.

With respect to the remaining infringement claims at issue in this motion (Counts V through VIII), the court agrees with Citicorp that they are barred by the doctrine of laches. The doctrine of laches is derived from the maxim that "those who sleep on their rights, lose them." *Chattanoga Manufacturing, Inc. v. Nike, Inc.*, 301 F.3d 789, 792 (7th Cir. 2002) (citing *Hot Wax, Inc. v. Turtle*

*Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999).) For laches to apply in a trademark infringement

case, the defendant must show (1) an unreasonable lack of diligence by the party against whom

the defense is asserted and (2) prejudice arising therefrom. *Bunn-O-Matic v. Bunn Coffee Service,*

*Inc.*, 88 F.Supp.2d 914, 925 (C.D. Ill. 2002) (citing *Hot Wax*, 191 F.3d at 820.) Courts have

recognized that "[e]ven if the elements of laches are established, however, a court need not bar

a plaintiff's suit. The application of the laches defense is discretionary, and as an equitable matter,

the district court is to look to all the facts and circumstances of the case and weigh the equities of

the parties." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 27 F.Supp.2d 1043, 1048 (N.D. Ill. 1998), *aff'd,* 191

F.3d 813.

Laches can arise only where the plaintiff knew or should have known of the defendant's

activities. Actual or constructive knowledge is sufficient, *id.* at 793, as the Seventh Circuit has

recently reiterated:

> [T]he law is well settled that where the question of laches is in issue the plaintiff is
> chargeable with such knowledge as he may have obtained upon inquiry, provided
> the facts already known by him were such as to put upon a man of ordinary
> intelligence the duty of inquiry.

*Chattanoga,* 301 F.3d at 793, quoting *Johnston v. Standard Mining Co.*, 148 U.S. 360, 370 (1893).

Here, Clever Ideas alleges that it did not learn of Citicorp's infringing behavior until 2002, but the

record demonstrates that Clever Ideas at least had constructive knowledge years earlier. For

example, in Count V of the Complaint (trademark infringement), Clever Ideas itself alleges that:

> For eleven years, CDC by its words and actions, led CLI to believe that CDC used
> the LE CARD mark in connection with the Corporate DC/LeCard Plan pursuant to
> its license under the Agreement. The May 21, 2002 letter was the first time that
> CDC asserted that CDC's Corporate DC/LeCard Plan, and the money CDC
> received thereunder, was not covered by the Agreement and the license.

(Complaint ¶ 77.) This assertion is an odd one; neither party appears to contend that the

Corporate Card program dates back 11 years. The allegation demonstrates, however, that Clever

Ideas has been aware for years that Citicorp was using the LeCard in connection with the

Corporate Card plan, and was allegedly unaware only that Citicorp believed it was not obliged to share revenue from that plan with Clever Ideas.

The 1997 letters from Higgins to Schneider, copies of which were attached to Citicorp's Answer, confirm that at least as early as January 1997, Clever Ideas was aware that Citicorp was expanding the LeCard program to include corporate clients, specifically IBM, and actually demanded that Citicorp begin using the LeCard mark on the corporate Diners Club cards as soon as possible.[11]   (Letter from Higgins to Schneider of Jan. 28, 1997, Ex. C to Answer and Counterclaim.)

Clever Ideas argues that it first learned of the infringement of its mark in May 2002, when Rubinstein wrote to Sloane that:

> When the 1990 Agreement was signed, CDC did not offer a separate Corporate Card program.  Accordingly, when the CDC Corporate Card program was created in 1996, it was not covered by the 1990 Agreement . . . [T]he 1990 Agreement was never amended or modified to encompass the Corporate Card program.  The terms and conditions of the 1990 Agreement thus never applied to the Corporate Card program.

(Clever Ideas' Mem. at 2, 5-6 (citing Letter from Rubinstein to Sloane of May 21, 2002, Ex. I to Citicorp's Mem.)  Assuming that this constitutes an admission that Citicorp was infringing upon Clever Ideas' trademark, other evidence in the record shows that Clever Ideas could have discovered the alleged infringement much earlier had Clever Ideas been more diligent.  For example, the March 30, 1999 letter from Turk to Suckow contained the same assertion Rubinstein made to Sloane that the 1990 Agreement did not cover the Corporate Card program.  (Letter from Turk to Suckow of March 30, 1999, Ex. E to Complaint.)  The 1997 letters are perhaps the most damaging to Clever Ideas, for they demonstrate not only that Clever Ideas was aware of IBM's involvement in the Corporate Card program, but also that Clever Ideas encouraged Citicorp to

---

[11]    Although the court need not reach the issue to decide these motions, this letter casts doubt on Clever Ideas' assertions that Citicorp did not have a license to use the LeCard mark in connection with the Corporate Card program.

issue Diners Club cards with the LeCard marks "at the first possible opportunity to do so." (Letter from Higgins to Schneider of Jan. 28, 1997, Ex. C to Answer and Counterclaim.) As Citicorp argues here, whatever the merits of Clever Ideas' argument that it did not grant Citicorp permission to use the mark, that argument is plainly tardy.

As this court understands Clever Ideas' position, Clever Ideas claims that it could not have been on notice of Citicorp's infringement because until 2002, Citicorp tricked Clever Ideas into believing that Citicorp had the right to use the LeCard trademark in connection with the Corporate Card program. (Clever Ideas' Memorandum of Law in Opposition to Citicorp's Motion for Judgment on the Pleadings, at 5, 6.) Apart from the peculiarity of the argument that an infringing party can mislead the copyright owner into believing the infringer has the right to infringe, the court notes that Clever Ideas has misconstrued Citicorp's position: Citicorp insists it did have permission under the 1990 Agreement to create a Corporate Card program,[12] but that the 1990 Agreement did not set forth the terms on which fees from such a program would be shared. In any event, the court is unaware of any case law (nor has Clever Ideas cited any) holding that Citicorp's alleged lack of candor excuses a trademark owner from the responsibility to diligently protect his own intellectual property. *Safeway Stores, Inc. v. Safeway Quality Foods, Inc.*, 433 F.2d 99, 103 (7th Cir. 1970) (plaintiff chargeable with information it might have received had due inquiry been made). Clever Ideas' delay of at least five and one half years in bringing suit to protect its trademark is unreasonable.

The Lanham Act does not set a statute of limitations for a federal unfair competition or a trademark infringement claim, but the Seventh Circuit explained in *Hot Wax* that courts should refer "to analogous state statutes of limitations to determine whether a presumption of laches should apply." 191 F.3d at 821. The three-year statute of limitations under the Illinois Consumer Fraud

---

[12]     Indeed, the list of "eligible" cardholders appended to the 1990 Agreement does include corporate cardmembers. (Agreement Art. I(F).)

and Deceptive Business Practices Act, 815 ILCS 505/10(a)(e), has been applied to the Illinois Uniform Deceptive Trade Practices Act, which forms the basis for Clever Ideas' Count VIII. *Elrad v. United Life and Acc. Ins. Co.*, 624 F.Supp. 742, 745 (N.D. Ill. 1985); *see also Chattanoga*, 140 F.Supp. 2d at 931; *Hot Wax, Inc. v. Warsaw Chem. Co., Inc.*, 45 F.Supp.2d 635, 647 (N.D. Ill.1999). That statute of limitations is thus applicable to Clever Ideas' trademark and unfair competition claims.

The fact that Clever Ideas demanded as early as March 1999 that Citicorp split the fees derived from the Corporate Card program belies Clever Ideas' assertion that it was reasonable to wait until July 2002 to file suit. Based on Clever Ideas' knowledge of Citicorp's use of the LeCard mark in connection with the Corporate Card program, the court concludes that Clever Ideas had a duty to investigate whether its mark was being used lawfully. *Chattanoga*, 140 F.Supp.2d at 931 Yet inexplicably, Clever Ideas took no action until 2002, when Citicorp terminated the Agreement, and at least five years after it knew about or even encouraged Citicorp's prompt use of the mark. Clever Ideas might argue that it understood Citicorp's use of the marks for the Corporate Card plan would be governed by the parties' Agreement. Such an understanding is not, however, consistent with Clever Ideas' assertion that it was unaware of the existence of the Corporate Card plan at all.

Even where, as here, there has been unreasonable delay, the court must consider the issue of prejudice to the defendant before the court concludes a claim is barred by laches. The Seventh Circuit has explained that "[a] delay prejudices a defendant when the assertion of a claim available for some time would be inequitable in light of the delay in bringing that claim and ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." *Chattanoga*, 301 F.3d at 795 (citation omitted). In *Hot Wax*, for example, where the plaintiff waited more than ten years before filing suit against its competitor, Turtle Wax, for trademark infringement, the Seventh Circuit noted that during the time plaintiff "sat idly by . . . [,] Turtle Wax invested significant amounts of time and money in product development and

22

advertising." 191 F.3d at 824. Citicorp claims that it placed the marks and logo on corporate cards, advertised the program to corporations and corporate cardmembers, provided a discount to corporate cardmembers, and paid Clever Ideas for the use of the marks all in reliance on its belief that it had a license to use the mark in connection with the Corporate Card program. (Citicorp Reply, at 12.) The record supports at least some of these assertions; there is evidence in the Agreement itself that could that support Citicorp's belief that it had a license to use the mark in this way, as well as evidence that Citicorp paid a discount to corporate cardmembers. On the other hand, Citicorp's insistence that it paid Clever Ideas for the use of the marks appears to ignore the fact, that apart from a one-time payment in 1999, it has never shared with Clever Ideas any of the revenues from the Corporate Card program.

Nevertheless, although the court is not convinced that the prejudice to Citicorp was overwhelming, the court concludes that allowing Clever Ideas to pursue these claims now would be unfair. Unlike the situation in *Hot Wax*, where the parties were not even involved in business with each other, Clever Ideas and Citicorp formed a partnership in 1990 in which Clever Ideas granted Citicorp the right to use the LeCard trademark. Citicorp placed Clever Ideas' marks on Dining Card credit cards, marketed the plan to corporations and individuals, and paid Clever Ideas for use of the mark and logo. To permit Clever Ideas to assert infringement now puts Citicorp at an unfair disadvantage. *See E.E.O.C. v. Vucitech,* 842 F.2d 936, 942 (7th Cir. 1988) ("If the defendant in a suit for trademark infringement had been led to believe that that plaintiff would not sue, and in reliance expended large sums of money on exploiting the allegedly infringing trademark, he can plead laches if the plaintiff later sues, even if the delay has not impaired his ability to defend in the slightest.") (citations omitted). Particularly in light of Clever Ideas' acceptance of a substantial (albeit singular) payment in 1999, Clever Ideas may not now argue that Citicorp has suffered no prejudice from Clever Ideas' delay in challenging the purported

infringement.[13]

In this court's view, Clever Ideas' objection to Citicorp's conduct is not that Citicorp is infringing its mark, but that Citicorp has used Clever Ideas' mark for the Corporate Card program without compensating Clever Ideas for it. In any event, the court concludes that Clever Ideas is barred by the doctrine of laches from pursuing the infringement claims in Counts V through VIII.

## II.    Cross Motions for Partial Summary Judgment

In its motion for partial summary judgment, Clever Ideas asks the court to declare unenforceable the provisions of the 1990 Agreement Citicorp invoked in 2002 as grounds for terminating the contract, hold that Citicorp is accordingly bound by the three-year non-compete provision contained in the 1990 Agreement, and dismiss Count I of Citicorp's counterclaim (which alleges that Clever Ideas materially breached the 1990 Agreement). Citicorp has filed a cross-motion for partial summary judgment, requesting that the court declare enforceable the contractual provisions invoked by Citicorp as enforceable, declare that if Citicorp properly terminated the 1990 Agreement for reason of Clever Ideas' material breach, the three-year covenant not to compete in the 1990 Agreement does not bind Citicorp, and grant Citicorp judgment on Count IX of Clever Ideas' Complaint.

---

[13]    Put another way, having accepted payment for the corporate program, Clever Ideas is estopped from arguing that the program was unauthorized. *Cf. AmCan Enterprises, Inc. v. Renzi,* 32 F.3d 233, 235 (7th Cir. 1994) ("If the licensor does not maintain adequate quality control, the mark may be deemed abandoned, or, equivalently, the licensor may be estopped to complain about infringements of it." ) (citations omitted). Indeed, some courts have noted the close similarity between the doctrines of estoppel and laches, which may explain Citicorp's decision to discuss only one of them. *See ProFitness Physical Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.,* 314 F.3d 62, 67-68 (2d Cir. 2002); *Piper Aircraft Corp. v. Wag-Aero, Inc.,* 741 F.2d 925, 938 (7th Cir. 1984), quoting 2 TRADEMARKS AND UNFAIR COMPETITION 551, 565 (2d ed. 1984) ("Estoppel by laches = delay x prejudice."). Ironically, Clever Ideas, not Citicorp, raised the matter of estoppel. The court is unmoved by Clever Ideas' notion that Citicorp is estopped from raising the issue of timeliness; the record presents no evidence that Citicorp intentionally misled Clever Ideas about the nature of the Corporate Card program.

## A.    Are the Contractual Provisions Enforceable?

Citicorp alleges that Clever Ideas breached the following provisions of the 1990 Agreement:

(1)    "CLI agrees to use its best efforts to promote and publicize to restaurants the availability of the Plan." (Agreement Art. III(C).)

(2)    "CLI agrees to establish and maintain Member Restaurant Agreements with a sufficient number and quality of restaurants to adequately support the Plan." (*Id.*)

(3)    "CDC shall have the right to terminate this Agreement effective upon written notice received by CLI in the event CDC determines, in its sole judgment: (i) that the Plan has insufficient consumer appeal, or (ii) that there are an insufficient number or type of Member Restaurants to maintain consumer appeal of the Plan." (Agreement Art. IV(D)(3)(c).)

(4)    "CLI shall not take any action that could be detrimental to the goodwill associated with the Diners Club Marks or with CDC. CLI shall operate its business and perform all services in accordance with the highest standards of quality associated with the industry and in accordance with good trademark practice." (Agreement Art. IV(A)(1)(b).)

(5)    "CLI agrees to provide to CDC, on an annual basis and within 30 days after its preparation, a copy of CLI's annual balance sheet as of the end of CLI's fiscal year and CLI's income statement for such year." (Agreement Art. IV(D)(3)(b).)

Clever Ideas argues that because each of these provisions is indefinite, each is unenforceable under Illinois law. Accordingly, Clever Ideas asserts, its alleged failure to comply with these terms could not constitute a material breach of the Agreement, nor can they be invoked to support Count I of Citicorp's Counterclaim. (Clever Ideas' Memorandum of Law in Support of its Motion for Summary Judgment, hereinafter "Clever Ideas' Summary Judgment Mem.," at 7.)

Citicorp responds that courts favor enforceability of contractual terms, and that these provisions are not so indefinite or ambiguous that they must be declared unenforceable. (Citicorp's Memorandum of Law Responding to Clever Ideas' Motion for Partial Summary Judgment and in Support of Citicorp's Cross-Motion for Partial Summary Judgment, hereinafter "Citicorp's Summary Judgment Mem.," at 7-9.) The court shall address each provision, but notes that the parties devote the most attention to the "best efforts" clause. Additionally, because the second and third

provisions overlap, the court shall discuss them together.

    1.    *CLI agrees to use its best efforts to promote and publicize to restaurants the availability of the Plan. (Agreement Art. III(C).)*

Clever Ideas argues that the "best efforts" provision is unenforceable because Illinois courts have "uniformly found that a contractual 'best efforts' commitment is too indefinite and uncertain to support an action for breach." (Clever Ideas' Summary Judgment Mem., at 8.) In fact, in at least a handful of cases, courts have enforced such language. *See Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992) ("Beraha correctly points out that Illinois courts have enforced best efforts clauses."); *see also GLS Development, Inc. v. Wal-Mart Stores, Inc.*, 944 F.Supp. 1384, 1392 (N.D. Ill. 1996) ("Illinois courts have not categorically rejected all contracts that explicitly require 'best efforts' performance.")

That said, Clever Ideas is correct that Illinois courts have been more reluctant than most to enforce such provisions. *See Penzell v. Taylor*, 219 Ill.App.3d 680, 579 N.E.2d 956 (1st Dist. 1991); *Garbelmann v. Creditcard Keys Co.*, No. 89 C 6020, 1992 WL 73531 (N.D. Ill. March 27, 1992). These cases clarify that a simple promise to use "best efforts" is unenforceable if no criteria exist by which to measure the effort. For example, in *Kraftco Corp. v. Kolbus*, 1 Ill.App.3d 635, 274 N.E.2d 153 (4th Dist. 1971), cited by Clever Ideas, the court concluded that an oral distributorship contract lacked mutuality where the distributor's only obligation was to use his "best efforts" to sell the products. In reversing a judgment against the distributor, the appellate court concluded that such an obligation was too indefinite and uncertain to be an enforceable standard. *Id.* at 639. *Kraftco* did not hold that best efforts clauses are *per se* unenforceable, however; instead, the court determined that where there is no obligation regarding duration, prices, area, products, quotas, and quantity set forth in the contract, the contract lacks the requisite certainty to be enforceable. *Id.* at 638-39.

In other cases, as well, Illinois courts have enforced contractual "best efforts" clauses only

where the contract also contains some objective criteria by which to judge whether the proper effort has been made. In *Heritage Remediation/Engineering, Inc. v. Wendnagel*, No. 89 C 413, 1989 WL 153373, * 6 (N.D. Ill. Nov. 9, 1989), the parties entered into two written agreements concerning environmental cleanup of a parcel of land owned by defendants. 1989 WL 153373 at * 1. Because the specific amount of contamination on defendants' property was not known at the time of the first agreement, plaintiff's duties were limited to using its "best efforts" to remove as much lead and xylene as possible. With respect to xylene, the stated goal was to remove all xylene in excess of 2.1 parts per million, although the contract explicitly provided that failure to meet it was not to be considered a breach. *Id.* at *2. Approximately two weeks after entering into the initial contract, and soon after the plaintiff had begun work, the parties determined that far more contamination was present than had been anticipated. Therefore the parties entered into an "Addendum Agreement," estimating more precisely the amount of xylene and lead to be excavated. By the agreed deadline, plaintiff had excavated more than the estimated amount of contaminated material, but defendants refused to pay, arguing that because the contract required only that plaintiff use its "best efforts" to meet target levels, the provision lacked mutuality and was unenforceable. *Id.* at *4-5. The court rejected the argument, noting that both the original agreement and the addendum provided objective standards (weight estimates and target levels) sufficient to measure the plaintiff's efforts. *Id.* at *6.

In another case, cited by both parties here, an Illinois court has observed that a contract's original indefiniteness can be cured when the parties subsequently specify the intended performance. In *Gustafson v. Lindquist*, 40 Ill.App.3d 152, 154, 351 N.E.2d 280, 282 (1st Dist. 1976), the defendant issued three successive promissory notes to the plaintiff, each one replacing the other. The third note included an increase over the second which represented a bonus payment to plaintiff, initially orally agreed to by the parties a year earlier when plaintiff promised to work the night shift in defendant's machine shop. The oral agreement did not specify a specific

figure for the bonus, but the promissory note specified an amount. *Id.* After defendant refused to pay a portion of the third note, plaintiff sued. The court held that the defendant was bound by the promissory note, and that the earlier agreement to provide a bonus did not fail for indefiniteness because the parties later came to a specific agreement. *Id.* at 157, 351 N.E.2d at 284.

In at least a few other cases, courts have enforced "best efforts" obligations even without any additional objective criteria. In *Muka v. Estate of Muka*, 164 Ill.App.3d 223, 226, 517 N.E.2d 673, 676-77 (2d Dist. 1987), for example, plaintiff sued to enforce a contract in which he agreed to work in the defendant's new business in return for $1 million worth of stock in that business. The letter agreement required only that plaintiff work "reasonably hard & smart at things in the next year." *Id.* at 226, 517 N.E.2d at 675. Likening that obligation to a "best efforts" provision, the court held that although its description was imprecise, plaintiff's obligation to work hard "at things" (presumably, business projects) was enforceable, and remanded to the trial court for a jury determination of whether he had met that obligation. *Id.* at 231, 517 N.E.2d at 678.

Similarly, in *Gentieu v. Tony Stone Images/Chicago, Inc.*, 255 F.Supp.2d 838, 844 (N.D. Ill. 2003), a photographer entered into an contract appointing defendant as her exclusive licensing agent and requiring that the agent "use its best efforts to license the Images and to maximize the overall earnings . . . ." *Id.* at 867. Because of the exclusive nature of the license, plaintiff's compensation for images was completely dependent on defendant's sale of those images. Accordingly, the court held that the "best efforts" clause in the contract was enforceable as "an express articulation of that otherwise implied obligation" to use "good faith, reasonable efforts to promote [Plaintiff's] images." *Id.* at 868. *See also W.P. Iverson & Co. v. Dunham Mfg. Co.*, 18 Ill.App.2d 404, 152 N.E.2d 615, 620 (1st Dist. 1958) (upholding exclusive distribution contract where seller did not have to sell a minimum amount of goods, but promises to "exercise its best effort to build up a market for and sell the product in question and would exercise good faith and

reasonable diligence in obtaining orders . . .").[14]

The *Gentieu* rationale is relevant here, as well. Clever Ideas and Citicorp were the only two entities who had rights to operate the LeCard program; therefore the parties depended on each other to ensure the program's success. If either party was dissatisfied with the other's performance, the plan was itself in jeopardy, for there was no other entity to turn to for improvement. Indeed, a provision of the Agreement stated that "during the term of this Agreement, CDC will not establish a discount dining program which has as its basis a barter-type arrangement with restaurants, nor will it cause anyone else to do so or instruct any third party in the establishment of such a program." (Agreement Art. IV(C)(1).) In this regard the 1990 Agreement resembles the exclusive contract of *Gentieu,* and the court concludes that the best efforts language is enforceable.

Although the case law described here does not offer explicit guidance, it satisfies the court that disputes of material fact preclude summary judgment on the enforceability of the "best efforts" clause in this case. There is evidence that the parties agreed to at least some specificity concerning Clever Ideas' obligations. The 1993 letter from Patricia Foell of Citicorp to Lee Suckow is one example, for Foell provided specific goals Citicorp wanted Clever Ideas to meet in various markets nationwide. (Letter from Foell to Suckow of Dec. 9, 1993, Ex. 2(A) to Citicorp's 56.1.) The March 1999 letter from Heather Turk of Citicorp to Suckow is another example: that letter set forth

---

[14] Even where an agreement contains no specific numbers by which to judge the parties' performance, it may be rendered enforceable by reference to performance, particularly where an exclusive relationship is involved. For example, in *Skinner v. Shirley of Hollywood,* 723 F.Supp. 50, 53 (N.D. Ill. 1989), defendant, a lingerie manufacturer, hired plaintiff to be its sole sales agent for an exclusive territory of the Midwest. The court denied defendant's motion to dismiss, plaintiff's breach of contract claim, stating "[i]n light of the fact that both parties had been fully performing under the contract for eleven years prior to the alleged breach, Shirley's position that the agreement was vague and unclear is disingenuous." *Id.* Although the opinion does not reveal whether the agreement in *Skinner* contained a best efforts clause, the court's observation about the duration of the relationship is relevant here. The court is reluctant to entertain an argument from either Clever Ideas or Citicorp that the best efforts clause is ambiguous after twelve years of performance under the contract.

specific numerical goals for member restaurants, goals for the number of transactions, and goals for increasing the amount spent on every transaction. (Letter from Turk to Suckow of March 30, 1999, Ex. E to Complaint.) The letter included a chart breaking down the markets in the United States and listed goals for each market.[15] (*Id.*)

Clever Ideas contends that the March 1999 letter was not a contract between the parties, but the court finds this issue irrelevant. The case law does not suggest that to clarify the terms of a contract, the parties must enter into a new contract supported by consideration. The 1990 Agreement was for an indefinite duration. It is therefore understandable that the parties would, from time to time, set new performance goals. In contrast to the contract in *Kraftco*, here the parties entered into a detailed, 25 page agreement: only five provisions are challenged here. And as in *Skinner,* the fact that the parties performed under the contract for 12 years seriously detracts from Clever Ideas' argument that its terms are too indefinite to be enforced.

Clever Ideas also argues that the March 1999 letter is admissible because the 1990 Agreement contains an integration clause. Such clauses, however, only prevent the introduction of writings, agreements or conduct occurring before the contract was entered into, unless the parties agree otherwise. *A.W. Wendell and Sons, Inc. v. Qazi*, 254 Ill.App.3d 97, 105, 626 N.E.2d 280, 287 (2d Dist. 1993). The court likewise rejects Clever Ideas' argument that the term "goals" used in the 1999 letter is not enforceable. As Citicorp points out, this court has specifically stated that where a "goal is provided or where there are standards by which to measure the effort, there is no problem in a 'best efforts' contract with either vagueness or failure of consideration." *Wendnagel*, 1989 WL 153373, at * 6.

    2.    *CLI agrees to establish and maintain Member Restaurant Agreements with*

---

[15]    Clever Ideas might argue that the goals set forth in Turk's March 1999 letter were conditions for going forward with the Corporate Card plan, not glosses on the 1990 Agreement. Clever Ideas has not made such an argument, however, and the court is not inclined to develop such an argument when Clever Ideas itself seeks summary judgment.

> a sufficient number and quality of restaurants to adequately support the
> Plan, and CDC shall have the right to terminate this Agreement effective
> upon written notice received by CLI in the event CDC determines, in its sole
> judgment: (i) that the Plan has insufficient consumer appeal, or (ii) that there
> are an insufficient number or type of Member Restaurants to maintain
> consumer appeal of the Plan. (Agreement Art. III(C); IV(D)(3)(c).)

For reasons similar to those discussed above, the court concludes these provisions also are enforceable. The court agrees with Clever Ideas that "sufficient" and "adequate" are indefinite terms, but ultimately concludes that the course of conduct between the parties over twelve years helped clarify the contractual terms. For example, there was communication in 1995 between the parties concerning the new Transmedia-American Express partnership and the need to respond accordingly by expanding the number of restaurants in the LeCard plan. (Letter from Turk to Higgins of Dec. 5, 1995, Ex. F to Complaint.) And as discussed previously, the 1999 letter, which was signed by representatives of both Citicorp and Clever Ideas, listed specific numerical goals in various areas. Finally, if Clever Ideas felt that the terms "sufficient" or "adequate" were too indefinite to have any meaning, Clever Ideas could have sought clarification at some point early on, or terminated the contract, as it was entitled to do. That Clever Ideas failed to do so supports the court's conclusion that there are disputes of fact concerning the enforceability of these provisions, requiring that Clever Ideas' motion for judgment in its favor on the issue must be denied. *See Skinner,* 723 F.Supp. at 53.

> 3.    *CLI shall not take any action that could be detrimental to the goodwill
>       associated with the Diners Club Marks or with CDC. CLI shall operate its
>       business and perform all services in accordance with the highest standards
>       of quality associated with the industry and in accordance with good
>       trademark practice. (Agreement Art. IV(A)(1)(b).)*

Citicorp charged Clever Ideas with breaching this portion of the Agreement by failing to promote the plan and failing to maintain restaurants of sufficient number and quality in the plan. Citicorp complained that Clever Ideas' staff generated complaints from both restaurants and banks with whom they did business, and failed to perform even the most ministerial tasks in a professional

manner, such as submitting up-to-date lists of member restaurants. (Letter from Rubinstein to Sloane of May 20, 2002, Ex. I to Complaint.) Clever Ideas argues that this provision is too indefinite because it fails to provide any criteria for what would be detrimental to Citicorp's goodwill, and fails to provide any objective standards for what Clever Ideas must do to comply with industry standards. In Citicorp's view, although these provisions appear in the section of the Agreement entitled "Trademarks and Service Marks," and refer specifically to Clever Ideas' use of Citicorp's trademarks, their meaning is sufficiently clear. Here, again, the court is not persuaded that there are no disputes of fact concerning the enforceability of these provisions. In the context of the Agreement, the court presumes that "industry" referred to dining discount credit card programs, such as the LeCard plan, and that Clever Ideas was in a good position to judge what actions would be detrimental to its partner Citicorp. The court concludes that in the context of the 1990 Agreement as a whole, Plaintiff has not satisfied the court that these provisions are unenforceable as a matter of law.

4. *CLI agrees to provide to CDC, on an annual basis and within 30 days after its preparation, a copy of CLI's annual balance sheet as of the end of CLI's fiscal year and CLI's income statement for such year. (Agreement Art. IV(D)(3)(b).)*

Citicorp alleges that Clever Ideas' breach of this provision was material in that it prevented Citicorp from determining whether Clever Ideas' business or financial condition had undergone materially adverse change (which would then give Citicorp the discretionary right to terminate the contract). Clever Ideas argues that if Citicorp could not declare Clever Ideas in material breach for suffering an adverse change in its financial condition, then Clever Ideas' purported failure to provide financial information cannot be the basis for declaring Clever Ideas in material breach. The court is uncertain about the thrust of this argument, but in any event concludes that at this juncture it need only determine whether there are disputes concerning the enforceability of the provision. The court has little difficulty determining that the provision is clear and sufficiently definite on its

32

face. Whether Clever Ideas breached it, whether such breach was material, and whether the breach was sufficient for Citicorp to conclude that Clever Ideas' financial condition had materially worsened, are issues to be decided on a later date.

Because the court denies Clever Ideas' motion for partial summary judgment and declines to hold the contested provisions of the 1990 Agreement unenforceable, it is unnecessary to address Citicorp's cross-motion. In that motion, Citicorp argued that if the provisions discussed above were unenforceable, the entire Agreement was rendered meaningless. Having concluded that there are disputes of fact concerning the enforceability of each of the challenged provisions, the court need not address this aspect of Citicorp's motion.

### B.    Material Breach

Both parties have also asked the court to grant summary judgment on the question of whether Clever Ideas' alleged failure to meet the obligations imposed by these provisions may fairly be characterized as a "material breach." If Clever Ideas' actions are material breaches of the 1990 Agreement, Citicorp argues that it is not bound by the non-compete provision. The record is wholly insufficient on this issue, however, and the court concludes neither side has met its burden here. Citicorp emphasizes the March 1999 letter from Turk which imposed conditions for Clever Ideas' participation in the profits from the Corporate Card program, but Citicorp itself insists that the corporate program was *not* part of the parties' original Agreement. And in fact Citicorp paid Clever Ideas on the Corporate Card program on only one occasion, presumably because Clever Ideas failed to meet the March 1999 condition. The court is therefore not prepared to conclude that Clever Ideas' failure to meet the 1999 requirements constitutes a breach of the parties' earlier Agreement. In this court's view, the parties' failure to include specifics concerning Clever Ideas' "best efforts" obligation militates against any determination that, as a matter of law, Clever Ideas' performance constituted a material breach. Thus, Clever Ideas may well be able to demonstrate

33

that its alleged failure to meet Citicorp's expectations does not excuse Citicorp from compliance with the Agreement's post-termination provisions, including the prohibition against competition. In short, neither party is entitled to summary judgment on this issue.

## CONCLUSION

For the foregoing reasons, the court grants Citicorp's motion for judgment on the pleadings (Doc. 22-1) with respect to Counts V through VIII under the doctrine of laches and dismisses those counts without prejudice, but denies Citicorp's motion to dismiss Counts I through III. The court denies Clever Ideas' motion for partial summary judgment (Doc. 29-1), and therefore strikes Citicorp's cross-motion for partial summary judgment (Doc. 36-1) as moot (except for the portion requesting a declaratory judgment, which the court denies on the merits). Clever Ideas' motion to strike portions of Citicorp's response to Clever Ideas' statement of undisputed material facts (Doc. 53-1) is denied as moot, as the court did not rely on any of those disputed statements in deciding these motions.

A status conference is set for September 18, 2003 at 9:30 a.m. The parties are directed to meet and confer prior to that date to discuss a settlement of their differences.

ENTER:

Dated: August 20, 2003

REBECCA R. PALLMEYER
United States District Judge

34